State v. Pollard.

# THE STATE v. POLLARD, Appellant.

## Division Two, May 19, 1903.

1. **Carnal Knowledge:** DEMURRER TO EVIDENCE. Where there is some testimony tending to establish the defendant's guilt of the charge of carnal knowledge of a female fourteen years old, the court should not direct the jury to find defendant not guilty.

2. **Witness:** CREDIBILITY: INSTRUCTION. It is not proper to single out each particular fact that may tend to affect the credibility of a witness. Nor is it proper to single out one witness. So where defendant is being tried for having carnal knowledge with a female fourteen years old employed in his hotel, it is not proper for an instruction to single her out, and call attention to her conduct at and about the time of the defilement, or direct attention to the length of time she afterwards remained in his employment, or to the length of time which elapsed before she made complaint.

3. **Carnal Knowledge:** COTEMPORANEOUS CONVERSATION WITH PROSECU-TRIX: RES GESTAE. A witness testified that about fifteen minutes after she heard the prosecutrix call her between six and seven o'clock of an August morning she suspected something wrong was going to be done, and she went down the stairs of defendant's hotel, and went to the door of the bedroom where it is alleged defendant had carnal knowledge with the fourteen-year-old prosecutrix; that prosecutrix removed a chair from the door and she went in, and found her sitting on the bed combing her hair and crying, defendant being out in the back yard; that she asked her what was the matter, and she at first refused to tell her, but later stated, "George forced me." Neither she nor the prosecutrix undertook to say how near this conversation was to the act of defilement. *Held,* not admissible as a part of the *res gestae.*

4. ———: CONVERSATIONS: WHEN RES GESTAE. Statements and conversations with the prosecutrix in a prosecution for carnal knowledge, in order to be admissible in evidence as *res gestae,* must be cotemporaneous with the defilement or be so closely connected with it as to form a part of it.

5. ———: ———: WITH DEFENDANT: AWARD FOR SILENCE. Conversations with defendant after the offense was committed and testimony that he gave five dollars to the witness not to tell his wife anything of what he had done to the prosecutrix, are admissible in evidence.

6. ———: OPINION OF OTHERS. The testimony of a witness that when she spoke to the police officer about defendant's defilement of the prosecutrix the police officer remarked that the defendant "would not keep a girl" (at his hotel) "unless he could have intercourse with her," was improper, and in a prosecution for illicit carnal knowledge was prejudicial.

7. **Impeachment of Witnesses:** GENERAL MORAL CHARACTER. The rule in this State as to the impeachment of defendant who offers himself as a witness, is that the inquiry need not be restricted to the trait of character in issue, that is, to his reputation for truth and veracity, but, as affecting his credibility, may be extended to general moral character; in this case, where defendant is charged with defiling a girl, to his general reputation for chastity and morality. But that rule is not approved by the judge who wrote the opinion in this case, because not in line with the current of authority, and because the reason therefor is not sound, since to inject into the case testimony as to other traits of character serves both to confuse the mind of the jury and prejudice them against defendant.

Appeal from Livingston Circuit Court.—*Hon. J. W. Alexander*, Judge.

REVERSED AND REMANDED.

*Scott J. Miller* for appellant.

(1)   What the policeman told Eva Enoch could not be introduced against defendant as evidence against him.   State v. May, 142 Mo. 154; State v. Burlingame, 146 Mo. 207.   (2)   She was also improperly permitted to state that the prosecutrix told her defendant had forced her.   (3)   While it is true that defendant can be impeached as other witnesses, yet in this case we take exceptions to the mode.   The State confined his impeachment to the time of the trial on morality and chastity, when, if he could have been impeached on these elements of reputation, it must have been at or before the charged commission of the crime.   When a man is accused of defiling a ward and thrown in jail, guilty or innocent, his reputation in the mouths of the usual scandal-mongers, receives a severe jolt.   State v.

Clawson, 30 Mo. 144. None of this evidence was competent, and it was, in this kind of case, very poisonous to the minds of the jury. The evident purpose of the State was to prove if he was not guilty as charged, he would have been if given the chance, "hence send him up" a few years anyway. State v. Grant, 79 Mo. 133; State v. Sibley, 131 Mo. 531; State v. Clawson, 30 Mo. App. 139; State v. Coffey, 44 Mo. App. 455. The more recent decisions of this court, however (State v. Rider, 95 Mo. 486; State v. Shoyer, 104 Mo. 441), hold that the rule applies alike to both sexes, and such reputation may be shown to discredit a male as well as a female witness. Such evidence is inadmissible in any case for the purpose of impeaching the character of a male witness, and especially in a case like the one in hand, where the defendant's character for chastity is directly involved. It is a matter of common knowledge that the bad character of a man for chastity does not even in remotest degree affect his character for truth, when based upon that alone, while it does that of a woman. It is no compliment to a woman to measure her character for truth by the same standard that you do that of man's predicated upon character for chastity. What destroys the standing of the one in all the walks of life has no effect whatever on the standing for truth of the other. Bank v. Stryker, 1 Wheel. Crim. Cas. 332.

*Edward C. Crow,* Attorney-General, *Sam B. Jeffries,* Assistant Attorney-General, and *Jerry M. Jeffries* for the State.

(1) Appellant complains of an alleged error in the introduction of evidence in this case which contention is based upon the following: "Q. What officer did you tell this occurrence to first? A. Mr. Bayles, I believe. Q. Policeman? A. Yes, sir. And he told me he would not keep a girl unless he could have inter-

course with her.'' Even though this was erroneous, the objection is without cause; it came after the answer and the court was not asked to strike it out. Defendant immediately began a cross-examination of the witness. If error, the point was not saved so as to make it subject to review by this court. Statements made by the prosecuting witness immediately following the commission of the crime are a part of the *res gestae* and are admissible. Hence, there was no error in the court's permitting the witness to say that Carrie Downing told her that the defendant had forced her. State v. Hudspeth, 150 Mo. 12; State v. Walpole, 76 Mo. App. 213; State v. Sexton, 147 Mo. 89. (2) Proof, even though it be conclusive, that the prosecutrix made contradictory statements is not sufficient to warrant a new trial. Here one witness said prosecutrix told her there was no truth in the charge. The jury could very readily disbelieve this statement. Such questions are always left to the jury. State v. Dewitt, 152 Mo. 76; State v. Williams, 149 Mo. 496; State v. Barton, 142 Mo. 450; State v. Napper, 141 Mo. 401. (3) Appellant complains of the action of the court in permitting the State to impeach defendant's testimony in his own behalf by introducing evidence that showed his general reputation for chastity and virtue to be bad. The court confined the evidence to his reputation at the time of the trial. This was proper. If defendant took the stand in his own behalf he was liable under the statute to be impeached the same as any other witness. State v. Summar, 143 Mo. 220; State v. Dyer, 139 Mo. 199; State v. Grant, 79 Mo. 133. In State v. Grant, supra, the court held that evidence showing the general reputation of the witness to be bad at the time of the trial was properly admitted to impeach his testimony. The rule here laid down applies to both sexes; so in the other cases cited. State v. Rider, 95 Mo. 486; State v. Shroyer, 104 Mo. 441. There is no reason for the rule contended for by appellant that such evidence can be used only to impeach the testimony

of female witnesses. It is within the knowledge of every man that a man who becomes a notorious whoremonger becomes a liar and "the truth is not in him." It is no recommendation of a rule that measures the character of a man for truth by less strictly drawn standards, than that of woman. Whatever will destroy the moral force of woman will just as quickly take from man his virtue, his chastity, his honesty and his truthfulness. With it all, the unchaste man, as was proven in this case, often takes woman in the very bud of her life and by force takes from her much of the hope of an immortal life and soon places upon her a ban which, according to the reasoning of appellant's counsel, will disqualify her from testifying in the courts of the land and leave him to continue in his work of devastation, and let his word be recognized with as much force, as much power and as far-reaching in its character as the word of the most upright and holy man or woman living. Such is not the law. In Missouri's tribunal of law, man and woman are measured by the same standard.

FOX, J.—This cause was prosecuted on an amended information filed by John H. Taylor, prosecuting attorney of Livingston county, in the circuit court of that county, on the 23rd day of September, 1902. The information charges defendant, on or about the 10th day of August, 1901, with defiling, feloniously and unlawfully carnally knowing one Carrie Downing, a young girl of fourteen years of age, who had been by her parents entrusted to his care, custody, confidence and employment.

There is no complaint urged against the information, hence, there is no necessity of inserting it in this opinion.

The defendant, George H. Pollard, was the proprietor of a hotel and lunch room in Chillicothe, Livingston county, Missouri. Carrie Downing, the prosecut-

ing witness, who was about fifteen years old, was confided to the defendant by her parents, to work for him about the hotel and lunchroom. She testified that about the 10th day of August, 1901, the defendant, in a bedroom in the hotel, had intercourse with her; she made no outcry as she states, because he was choking her. This occurred between six and seven o'clock in the morning. It further appears that the windows to this bedroom, where the offense is alleged to have been committed, were open. It is further stated by the prosecuting witness that after he had intercourse with her, she was sitting on the edge of the bed combing her hair and that Eva Enoch, one of the witnesses in this case, came down stairs and went into the room where Carrie Downing was and where she says the defendant committed the acts charged.

Eva Enoch, a witness for the State, testified that on the morning Carrie Downing says she was assaulted, Carrie called her and "asked her how long before she would be down;" she replied in about a half hour. She further stated that she suspected something, and put on her dress and went down without putting on her shoes. It further appears from her testimony that after coming down she went to the door of the bedroom; that there was a chair against the door; that Carrie removed the chair and was sitting on the bed crying when she went in. The defendant was not in the room, but was out in the back yard.

After entering the room, the witness and Carrie had a conversation. To this conversation, in the absence of defendant, counsel for defendant objected; which objection was by the court overruled, to which action of the court defendant duly excepted. Witness then proceeded to state that she asked Carrie what was the matter, and she says she would not tell me; "then she told me that George had forced her."

This last witness mentioned then left the bedroom, and went out into the yard where she met the defendant.

She says the defendant offered her, and she accepted, five dollars, upon the condition that she would not tell his wife what had occurred.    In addition to this testimony, numerous witnesses testify that the general reputation of the defendant for morality and chastity was bad.

The defendant was sworn as a witness in his own behalf.   His testimony was an absolute and unqualified denial of the statements made by the prosecuting witness and Eva Enoch.   Mrs. Thomas testified on the part of defendant, that after this charge was made against the defendant, the prosecuting witness was at her house and stated to her that there was nothing in the charge against the defendant; that she was forced to make it, and that Jim Smith was the cause of it all. Other witnesses testified whose testimony tended to show that defendant was on a trip to Kansas City about the time the prosecuting witness claims she was assaulted. Mrs. Bettie Rhodes testified that she was down stairs in the kitchen on the morning it is said this offense was committed.   She was about thirty feet away from the bedroom; the windows were open, and there was nothing to prevent her from hearing any unusual noise. She further states that she did not see witness Eva Enoch come down stairs, nor did she see her down stairs on the morning that the prosecuting witness says she was assaulted.

This constitutes, in the main, the testimony upon which this cause was submitted to the jury.   Upon the trial the jury returned a verdict of guilty, and assessed defendant's punishment at two years in the penitentiary. He was sentenced in pursuance to the verdict, and from this judgment this case is in this court upon appeal.

It is insisted by appellant that the court did not properly declare the law.   We have examined with care and due consideration all the instructions given by the court, and will, in the course of this opinion, refer to them as necessity requires.   We will say, however, that a very careful examination of them fails to verify

the contention of appellant. We find them full, fair and a proper presentation of the law as applicable to the testimony in this cause.

It is urged that the court erred in refusing three instructions tendered by appellant.

The first instruction prayed the court to declare the law, that under the evidence in this case, the jury should find the defendant not guilty. While the testimony offered by the State is not so clear and convincing as not to render it subject to the criticisms indulged in by counsel for defendant, yet there was some testimony tending to establish defendant's guilt; the credibility of the witnesses and the weight to be attached to their testimony, were matters to be determined by the jury. The court very properly refused to give that instruction.

The second, third and fourth instructions asked by defendant and refused by the court are as follows:

"2. The jury are instructed that they should consider the entire evidence in the case introduced by the State and defendant, but the jury are at liberty to disregard the evidence of all such witnesses, if any there be, as have been successfully impeached, either by direct contradiction, or by proof of having made different statements.

"3. The court instructs the jury that under the law a witness can be impeached by proof of having made contradictory statements, and if you believe from the evidence any witness has made contradictory statements, about material evidence in this case, you are at liberty to disregard all of such witness's testimony.

"4. The court instructs the jury that in determining the degree of credit to be given the evidence of the prosecutrix in regard to the alleged defilement, it is competent to consider the conduct of the prosecuting witness at and about the time thereof, the length of time that elapsed after the said offense had been committed before she made it known, the cause for

making it known, the fact that she was in defendent's company continually or nearly so, after the alleged offense for months or more, without complaint against him, along with all the other facts and circumstances in evidence.''

As the second and third instructions are practically directed to the same subject, that is, as to the manner of measuring and weighing testimony of witnesses testifying in the cause, we will treat them jointly. There is no merit in the contention of appellant as to the refusal of these instructions. Instruction number seven as given by the court, fully covered the subject as suggested in instructions numbered two and three. This being true, it needs no citation of authorities to support the position that there was no error in refusing those offered. Instruction number seven substantially told the jury: ''To the jury alone belongs the duty of weighing the evidence and determining the credibility of the witnesses. The degree of credit due to a witness should be determined by the jury, by his or her character and conduct, by his or her manner upon the stand, his or her fears, his or her bias or impartiality, the reasonableness or unreasonableness of the statements he or she makes, the strength or weakness of his or her recollection, viewed in the light of the other facts and circumstances in proof; and if the jury believe that any witness has willfully sworn falsely as to any material fact in the case, they may disregard the whole of the evidence of any such witness.'' Instruction number 4 as offered by appellant was properly refused. This instruction singled out one witness, and also singled out particular facts applicable to her testimony alone. While the jury were authorized in taking all such facts into consideration in determining her credibility and the weight to be attached to her testimony, it is not the rule to direct the attention of the jury to each particular fact that may tend to affect the credibility of a witness. The jury were instructed in declaration number 7 that

they have the right to consider "the reasonableness or unreasonableness of the statements he or she makes, the strength or weakness of his or her recollection, viewed in the light of the other facts and circumstances in proof." This direction was as applicable to the prosecuting witness as to any other witness in the cause, and it is not in accord with the well-established rule, in a case like the one before us, to call special attention to a witness and the particular facts to consider in connection with her testimony.

During the progress of the trial of this cause witness Eva Enoch testified, over the objection of defendant, that about fifteen minutes after the prosecuting witness called her on the morning in question, she suspected something wrong was going to be done, and she went down stairs in her stocking feet; went to the door of the bedroom where it is said this offense was committed; that the prosecuting witness removed the chair · from the door, when she went in the room; that Carrie Downing was sitting on the bed; witness says, "I asked her what was the matter; she wouldn't tell me; then she told me that George had forced her." The defendant was not present at this conversation, but was out in the back yard. Carrie Downing says in her testimony that when Eva Enoch came into the bedroom, she was sitting on the bed combing her hair. Neither Carrie Downing nor Eva Enoch undertook to designate how nearly this conversation was related to the time when the prosecuting witness says that defendant had intercourse with her. This testimony was objected to by counsel, objections overruled and exception duly taken. This testimony, doubtless, was admitted by the court on the theory that it was part of the *res gestae*. There are many cases holding, and correctly so, that exclamations by the parties or others at the time of the commission of the main act, or so nearly at the time of the act as to form part of it, are admissible on the ground that they form part of the *res gestae*. The question presented upon the com-

plaint of appellant in respect to this contention is, was the answer by Carrie Downing to Eva Enoch's inquiry, "George forced me," so closely allied or connected with the main act with which defendant is charged, as to make it competent upon the ground that it constituted a part of the *res gestae?* This statement that "George forced me" was no sudden exclamation, contemporaneous with the act constituting the offense. Defendant was out in the back yard, was not present; Carrie Downing removed the chair from the door, returned and was sitting on the bed combing her hair. This was not all: this declaration was not made to Eva Enoch immediately upon opening the door; but on the contrary, she at first refused to say anything; finally she made the statement. From the testimony of Eva Enoch, it seems that this statement, instead of being a sudden exclamation, following closely the act itself, was extracted from Carrie Downing after pressing her to tell what was the matter. This clearly was no part of the *res gestae,* and was inadmissible. This question as to when declarations and conversations are admissible as being a part of the *res gestae,* is fully discussed in a recent opinion of this court, in the case of State v. Hendricks, decided at the October term, in 172 Mo. 654; in that case all of this Division concurred, and the conclusion was reached, that such statements, in order to be admissible, must happen contemporaneously with the main act, and be so closely connected with it as to form a part of it. It was error to admit this testimony, and it was the duty of the court, upon objection by defendant, to exclude it. The subsequent part of Eva Enoch's testimony as to her conversation with the defendant in the yard, was competent.

Eva Enoch, upon examination in chief by the prosecuting attorney, was permitted to testify in the absence of the defendant to a conversation with an officer by the name of Bayles, a policeman. This question was asked witness by counsel for State: "Q. What officer did

you tell this occurrence to first? A. Mr. Bayles, I believe. Q. Policeman? A. Yes, sir. And he told me, he wouldn't keep a girl unless he could have intercourse with her.'' This witness was telling the officer about Pollard, and while her answer is not clear, yet when we consider that she was discussing Pollard, evidently in using the words, ''he told me he would not keep a girl unless he could have intercourse with her,'' she had reference to Pollard. The policeman clearly did not refer to himself, for they were not talking about his keeping a girl, and furthermore, if he was, and she was quoting him, she would have used the words, ''I would not keep a girl,'' etc., etc. This conversation, in the absence of the defendant, and being a mere expression of opinion of the police officer, as to the character of man that defendant was, in respect to keeping girls, was not only inadmissible, but was clearly incompetent testimony of a character calculated to prejudice the minds of the jury against the defendant.

The State introduced in rebuttal numerous witnesses who testified that the general reputation of defendant in the community in which he resided, for chastity and morality, was bad. To the introduction of this testimony appellant, in proper form, has preserved his objections and exceptions, and this is urged as error by the trial court. We will say in respect to this complaint, that the learned trial judge accepted and followed the rule adopted by a long line of decisions in this State, commencing with the case of State v. Shields, 13 Mo. 236, and followed in the cases of State v. Hamilton, 55 Mo. 520; State v. Breeden, 58 Mo. 507; State v. Clinton, 67 Mo. 380; State v. Miller, 71 Mo. 590; State v. Grant, 76 Mo. 239; State v. Raven, 115 Mo. 419; State v. Rider, 95 Mo. 486; State v. Shroyer, 104 Mo. 441. These cases announce the rule as to the impeachment of witnesses, that the inquiry need not be confined to the trait of character in issue, but may be extended to general moral character. In view of the long

and uniform adherence to the rule as announced in the cases quoted, and as this only constitutes one division of this court, I will not undertake to overrule the doctrine thus announced; but I will say for myself, that the rule upon the impeachment of witnesses should be restricted to the trait of character directly involved, that of truth and veracity. This rule is supported by the overwhelming weight of authority, and it is conceded by this court that the rule adopted and followed in this. State is opposed to the current of authorities upon this subject.

In the case of State v. Shroyer, 104 Mo. l. c. 446-447, MACFARLANE, J., speaking for the court, makes this very frank admission as to the law on this subject: "Defendant testified as a witness upon the trial in his own behalf, and, in rebuttal, the State introduced evidence to discredit his testimony. The impeaching witnesses were permitted, over defendant's objection, to testify as to defendant's general reputation for virtue and chastity. Defendant claims that error was committed in doing so. The authorities are not harmonious on this question. It is held in some States that the impeaching testimony must be confined to the reputation of the witness for truth and veracity, and in others that it may be properly extended to general moral character, and in others, again, to moral character in particular respects. A collection of the authorities may be found in 30 Cent. Law Jou. 241. This court has followed the rule that in discrediting a witness the inquiry may not only be extended to his general character, but to his character in respect to particular matters, as sobriety and chastity. [State v. Shields, 13 Mo. 236; State v. Grant, 76 Mo. 236; State v. Rider, 95 Mo. 486.] This rule seems to be in conflict with the current of authority, but no reason can be seen why it should be changed."

I can not agree to the last expression of the learned and esteemed judge that "no reason can be seen why it should be changed." The very statement that it is

opposed to the current of authority, if such authority is supported by sounder reason, furnishes the reason why the rule should be changed.

The American and English Encyclopedia of Law (1 Ed.), vol. 29, pp. 797 and 798, sec. 5, in the text treats of this question very clearly; it is announced: "When a witness has reached the bad eminence of notoriety as a liar in the community where he lives, he is liable to direct impeachment by proof of his general reputation for truth and veracity. The extent of the permissible inquiry into the character of a witness sought to be impeached has been the subject of much discussion and contrariety of opinion. There are many decisions in which it has been held that the impeaching party is not confined to evidence of the general reputation of the witness for truth and veracity, but may, also, offer proof in derogation of his general moral character. It is believed, however, that the better and safer rule is that impeaching evidence of this kind, except where it comes from the witness himself, on cross-examination, should be confined to proof of the general reputation of the witness for truth and veracity at his present or recent place of residence. By a strict adherence to this rule a witness who is notorious for his disregard of truth may always be successfully impeached, and, at the same time, the confusion which arises from a multiplicity of collateral issues may be avoided. This view is well supported by authority as well as by reason." The cases in support of this rule are very fully annotated in the notes.

To the same effect is the note discussing the case of State v. Sibley, 131 Mo. 519, where it is said in respect to the rule in Missouri: "In Missouri, the rule has long been maintained that inquiries into the character of a female witness for chastity are permissible for the purpose of impeaching and discrediting her testimony. [State v. Shields, 13 Mo. 236, 53 Am. Dec. 147; State v. Grant, 79 Mo. 133, 49 Am. Rep. 218.] And in that

State the rule has lately been extended to male, as well as female witnesses. [State v. Rider, 95 Mo. 486; State v. Shroyer, 104 Mo. 441, 24 Am. St. Rep. 344; State v. Raven, 115 Mo. 419.] It seems probable that the time must soon come when the rule must be abandoned, even in that State, as a whole, in view of the overwhelming array of authority supporting the contrary doctrine.'' [53 Am. St. Rep. 482.]

In the administration of the law, our efforts should always be directed in making the issues sharp and pointed; the impeachment of witnesses ought not to be any exception to the rule. The issue as to the credibility of a witness, is as to his truth and veracity; to inject into an effort to impeach him, other traits of character not in issue, only tends to confuse, and no one doubts that the triers of the facts never apply such collateral traits of character as to a test of credibility; but they simply serve the purpose of prejudicing the minds of the jury against the witness. The reason for the adoption of the present rule, in respect to impeachment of witnesses, has long been abandoned in this State. When the first case announced the doctrine now followed, the general reputation of a witness as to moral depravity was not regarded as having any impression on the credibility of a witness, unless it was followed up with questions showing its effect upon an application to the credibility of the witness.

In the case of State v. Shields, 13 Mo. 236, the case upon which the Missouri rule is based, Napton, J., says: ''A bad moral character generally, or a depravity not necessarily allied to a want of truth, may yet to some extent shake the credibility of a witness, and therefore, is a fair subject of investigation. The questions propounded in this case were proper, although they must necessarily, to have had any sensible impression upon the case, have been followed by others eliciting the opinion of the witness upon the effect which the general or

specific moral depravity spoken of, had upon the cred-
ibility of the witness attacked.''

At the time that case was decided, it was usual to
ask the witness, who had testified to the bad moral repu-
tation of the witness, whether he would believe him
on oath. This clearly indicates that the rule, when
first announced, contemplated some application to the
trait of character in issue, that of truth and veracity.
The method of examination of a witness, in respect to
impeachment, followed when the Shields case was de-
cided, has long since been abandoned.

Defendants, under the laws of this State, are per-
mitted to testify. And whether they testify, as the de-
fendant did in this case, this rule has been extended to
him, even if it involves the very trait of character in
the offense charged against him.

The defendant in this case is charged with defiling
a female under the age of eighteen, confided to his care.
The testimony introduced by the State was as to gen-
eral reputation for chastity and morality. This tes-
timony was admitted for the purpose of affecting his
credibility as a witness. It may have been admitted
for that purpose, but doubtless it was considered by
the jury for the purpose of increasing the probability
of his guilt. The rule is well settled that the defendant,
in order to lessen the probability of his guilt, had the
right to introduce testimony as to his good character;
but until he put such character in issue, the unbroken
line of authority is that the State can not attack his trait
of character involved in the charge.

In the case of State v. Clinton, 67 Mo. 380, NORTON,
J., cites a New York case, which gives as a reason for
attacking his character, even though it is not put in
issue, ''that the defendant elects to change his status
from a defendant to a witness.'' We will say in an-
swer to that reason, that the instructions of the trial
courts in every criminal case tried in this State, would
indicate that his status is not changed, for in every

instance where he testifies, the jury are told that in determining his credibility and the weight to be attached to his testimony, they may take into consideration that he is the defendant testifying in his own behalf.

In State v. Sibley, 131 Mo. 519, BURGESS, J., very clearly and forcibly draws the distinction between the application of the rule as to male and female witnesses, and speaking for himself, he adheres to the rule as announced on that subject in the earlier cases, and in addition he emphasizes the position by announcing that testimony of the character introduced in this case is inadmissible for the reason that the character of defendant for chastity is directly involved in the charge against him.

The trial court in this case is fully supported in its action in admitting this testimony as to the character of defendant by an unbroken line of cases in this State. As announced in the commencement of the treatment of this particular contention, I have given my own views upon this question.

Having indicated in this opinion the errors upon which this case should be reversed, it is therefore ordered that the judgment be reversed and cause remanded.

All concur.